**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| TAMARIS (GIBRALTAR) LIMITED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:23cv1692 (CMH/WEF) |
| | ) |
| PPGAMESUSA.COM et al.,  Internet | ) |
| Domain Names, | ) |
| | ) |
| Defendants. | ) |
| ———————————————————— | ) |

## REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff Tamaris (Gibraltar) Limited's—operating as

Pragmatic Play ("Plaintiff" or "Pragmatic Play")—Motion for Default Judgment pursuant to

Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 55(b)(2).  (Dkt. 12).  In this *in rem* action,

Plaintiff seeks entry of default judgment against twenty-eight (28) internet domain names[1]

(collectively, the "Defendant Domain Names" or "Defendants").   Pursuant to 28 U.S.C. §

636(b)(1)(C), the undersigned United States Magistrate Judge is filing with the Court these

proposed findings of fact and recommendations, a copy of which will be provided to all interested

---

[1]    The 28 Defendant Domain Names include:  PPGAMESUSA.COM,
PRAGMATICPLAYGAMING.COM, ASIAPRAGMATICPLAY.COM, PPPGAMES.NET,
PRAGMATICPLAYBONANZA.COM, PRAGMATICPLAYKR.COM,
PRAGMATICPLAYYSLOT.COM, PRAGMATICPLAYZEUS.COM, SG60-PPGAMES.NET,
STATIC-PPGAMES.NET, KRSTl-SG0-PPGAMES.NET, PP-GAMES.NET,
PRAGMATICPLAY-EN.NET, KGAME-PPGAME.NET, PRAGMATICPLAY-KOR.COM,
PRAGMATICPLAY-GSPLAY.COM, GSOFT65-PPGAMES.NET, GSTW0-PPGAMES.NET,
CN0-PPGAMES.NET, JPl-PPGAMES.NET, PRAGMATICPLAY-GOLDLINK.COM,
DKl0-PRAGMATICPLAY.NET, PRAGMATICPLAYHACKS.COM,
PPGAMESLOT345.COM, PRAGMATICPLAY-TH.NET, SGX-PPGAMES.NET, XXX-
PPGAMES.NET, and SG7-PPGAMES.NET.

1

parties.  For the reasons set forth below, the undersigned recommends granting Plaintiff's Motion for Default Judgment and awarding the relief sought.[2]

**Procedural Background**

On December 12, 2023, Pragmatic Play filed this lawsuit *in rem* against the Defendant Domain Names alleging violations of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).  (Dkt. 1, "Compl.").

Pragmatic Play is a leading developer and provider of mobile and desktop casino games for the online gaming industry.  (Compl. ¶ 40).  Pragmatic Play is the proprietor of its intellectual property rights, which encompass trademarks and other assets.  (*Id*.)  Since 2016, Pragmatic Play has been continuously developing, offering, and supplying a wide range of games under the PRAGMATIC PLAY and PPGAMES trademarks (the "PRAGMATIC PLAY and PPGAMES Marks").  (*Id*. ¶¶ 41–45).  In 2014, Pragmatic Play registered the domain name <PragmaticPlay.com> and began publishing gaming content on its website in 2015.  (*Id*. ¶ 46).  In addition to its common law rights in the PRAGMATIC PLAY and PPGAMES Marks, Pragmatic Play also possesses U.S. trademark registrations for the marks PRAGMATIC PLAY and PLAY PPGAMES in various classes of goods and services related to entertainment services and gaming software and hardware.  (*Id*. ¶¶ 56–57).  Pragmatic Play also owns a pending trademark application

---

[2]    Relevant filings before the Court include the Complaint (Dkt. 1) ("Compl."); Motion for Service by Publication (Dkt. 3); Memorandum in Support of Motion for Service by Publication (Dkt. 4); Declaration of Spencer C. Brooks in Support of Motion for Service (Dkt. 4-1); Court's Order Granting Motion for Service by Publication (Dkt. 6); Declaration of Spencer C. Brooks Regarding Court's Order on Motion for Service by Publication (Dkt. 8); Plaintiff's Request for Entry of Default (Dkt. 10); Declaration of Spencer C. Brooks in Support of Request for Entry of Default (Dkt. 10-1); Clerk's Entry of Default (Dkt. 11); Plaintiff's Motion for Default Judgment (Dkt. 12) ("Mot. Default J."); Memorandum of Law in Support of Plaintiff's Motion for Default Judgment (Dkt. 13) ("Mem. Supp."); and all attachments and exhibits submitted with those filings.

for the mark PPGAMES.  (*Id*. ¶ 58).

Pragmatic Play is constantly combatting third-party attempts to misuse its marks to confuse, mislead, and/or deceive consumers.  (*Id*. ¶ 53).  To protect its consumers and valuable marks, Pragmatic Play engages in significant enforcement efforts, including registering defensive domain names, issuing take-down notices, and engaging in anti-cybersquatting actions, such as this litigation.  (*Id*.)  Based on its protectible trademark rights in the PRAGMATIC PLAY and PPGAMES Marks, Pragmatic Play asserts that the Defendant Domain Names violate the ACPA because all the domain names reflect entire incorporations of the PRAGMATIC PLAY or PPGAMES marks and/or typographical errors of the marks, combined with descriptive terms related to Pragmatic Play's services or terms that are geographically descriptive, which cause the Defendant Domain Names to be confusingly similar to its marks.  (*Id*. ¶ 59).  Pragmatic Play alleges that the confusing similarity of the Defendant Domain Names to the PRAGMATIC PLAY and PPGAMES Marks intentionally divert consumers away from Pragmatic Play's legitimate online sources for commercial gain and/or unlawful purposes.  (*Id*. ¶¶ 60–65).  As a result, Pragmatic Play seeks an order requiring the domain name registry for the Defendant Domain Names—VeriSign, Inc.—to change the registrars of record for the Defendant Domain Names to Plaintiff's registrar of choice, SafeNames Ltd., and then direct the registrar to list Tamaris (Gibraltar) Limited as the registrant for the Defendant Domain Names.  (Compl. Prayer for Relief; Dkt. 12-1, Proposed Order).

On December 22, 2023, Pragmatic Play filed its Motion for Service by Publication supported by a brief and a declaration of its counsel, Spencer C. Brooks.  (Dkts. 3, 4).  The undersigned granted Pragmatic Play's motion on December 28, 2023 and authorized service by publication in *The Washington Times* or *The Washington Post* within fourteen (14) days after entry

3

of the order.  (Dkt. 6).  The December 28, 2023 Order required Defendants to answer or otherwise

respond to the Complaint within twenty-one (21) days from the date of publication of the Order in

*The Washington Post* or *The Washington Times*.  (*Id*.)  The undersigned also required Pragmatic

Play to serve a copy of the Order on the Defendants through the e-mail addresses and/or electronic

portal to the registrant(s) provided in the domain name registrations, if the registrant(s) have made

such contact information publicly available.  (*Id*.)  Pursuant to the December 28, 2023 Order, on

January 9, 2023, Pragmatic Play filed a declaration confirming that it had published the Order in

*The Washington Times* on January 5, 2024.  (Dkt. 8 ¶ 5).  The declaration also confirmed that

Pragmatic Play's counsel served a copy of the Order on the Defendants' registrant(s) via email, to

the extent the registrant(s) made their email contact information available.  (*Id*. ¶ 6).  Additionally,

where a Defendant Domain Name's WhoIs[3] registration identified an online portal to contact the

registrant, Pragmatic Play's counsel used that portal to provide the registrant with means of

contacting counsel to obtain a copy of the Order.  (*Id*.)  Moreover, where there was no electronic

means to contact the registrants, Pragmatic Play's counsel directed hard copies of the Order to be

mailed to the registrars and/or privacy service for those registrants.  (*Id*.)  Defendants were required

to answer or otherwise respond to the Complaint by January 26, 2024.  No one on behalf of the

Defendant Domain Names filed an answer or otherwise responded to the Complaint by January

26, 2024, or anytime thereafter.

On February 2, 2024, Plaintiff requested entry of default as to the Defendants with an

---

[3]      WhoIs is a "domain lookup [that] allows you to trace the ownership and tenure of a domain
name."  "The Whois database contains details such as the registration date of the domain name,
when it expires, ownership and contact information, nameserver information of the domain, the
registrar via which the domain was purchased, etc." *See* Whois Domain Lookup Frequently Asked
Questions, https://www.whois.com/whois (last visited June 7, 2024).  In other words, it is an
Internet domain "registry database."  *See Alfieri-Crispin v. Li Ting*, No. 1:15cv608 (AJT/MSN),
2015 WL 5560000, at *3 (E.D. Va. Sept. 11, 2005).

accompanying declaration of its counsel, Spencer C. Brooks, in support of its request.  (Dkt. 10).

The Clerk entered default as to the Defendant Domain Names on February 5, 2024.  (Dkt. 11).  On

February 15, 2024, Pragmatic Play filed its Motion for Default Judgment as to the Defendant

Domain Names and an accompanying memorandum of law.  (Dkts. 12, 13).  Plaintiff noticed the

Motion for Default Judgment for a hearing before the undersigned for March 1, 2024.  (Dkt. 14).

On March 1, 2024, counsel for Plaintiff appeared and presented argument in support of its motion,

and no one appeared on behalf of the Defendant Domain Names.  (Dkt. 15).  In fact, to date, no

party with an interest in the Defendant Domain Names has appeared or otherwise participated in

these proceedings.

Finding the allegations in the Complaint to be uncontested, the undersigned took the matter

under advisement to issue this Report and Recommendation.

### Facts Alleged in the Complaint and Deemed Admitted

Fed. R. Civ. P. 55 provides for the entry of a default judgment when "a party against whom

a judgment for affirmative relief is sought has failed to plead or otherwise defend[.]"  Based on

the failure of the Defendants to file an answer or other responsive pleading in a timely manner, the

Clerk entered default as to the Defendant Domain Names.  (Dkt. 11).  A defendant in default admits

the factual allegations in the complaint.  *See* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than

one relating to the amount of damages—is admitted if a responsive pleading is required and the

allegation is not denied."); *see also JTH Tax, Inc. v. Grabert*, 8 F. Supp. 3d 731, 736 (E.D. Va.

2014) (holding that when a defendant has defaulted, the well-pleaded allegations of facts set forth

in the plaintiff's complaint are deemed admitted) (citing *Ryan v. Homecomings Fin. Network*, 253

F.3d 778, 780 (4th Cir. 2001)).

In this case, the following facts alleged in the Complaint are deemed admitted.  Tamaris

(Gibraltar) Limited is a Gibraltarian limited liability company with a principal business address of Madison Building, Midtown, Queensway, Gibraltar. (Compl. ¶ 5). Tamaris (Gibraltar) Limited, operating as Pragmatic Play, is the proprietor of Pragmatic Play's intellectual property, including its trademarks and other assets. (*Id*. ¶ 40). Pragmatic Play is a leading developer and provider of mobile and desktop casino games for the online gaming industry. (*Id*.) Since receiving its first license in 2016, Pragmatic Play has acquired licenses in many regulated markets. (*Id*. ¶ 43).

### *Plaintiff's Trademark Rights in the PRAGMATIC PLAY and PPGAMES Marks*

Since 2016, Pragmatic Play has been actively and continuously developing, offering, and supplying a wide range of games under its PRAGMATIC PLAY and PPGAMES Marks. (*Id*. ¶ 41). The PRAGMATIC PLAY mark is often used as a word mark and displayed as plain text, and at times is also displayed in a stylized form with a design, as shown below:



Pragmatic Play has consistently used this composite mark in association with its gaming services for several years. (*Id*. ¶ 42). The PRAGMATIC PLAY word mark and design mark, shown above, are collectively referred to as the "PRAGMATIC PLAY Marks." (*Id*.) Pragmatic Play offers an array of games under the PRAGMATIC PLAY Marks, including online slot games, live casino games, bingo, and virtual sports. (*Id*. ¶ 44). These gaming services are available to U.S. citizens abroad, and a subset of these services are made available by social casino operators in select states in the U.S. in accordance with state and federal laws. (*Id*.)

Pragmatic Play has actively participated in marketing activities, such as year-round public relations campaigns, paid and earned content marketing, including webinars, feature stories, and

interviews, paid advertising such as display banners and newsletter sponsorship, sponsored and attended physical and virtual events, social media, including LinkedIn, Twitter, Facebook, and Instagram, and is consistently recognized as a leading supplier across tier-1 industry awards. (*Id*. ¶ 45). All of these marketing efforts prominently feature the PRAGMATIC PLAY Marks. (*Id*.) On October 29, 2014, Pragmatic Play registered the domain name <PragmaticPlay.com.> and first began publishing gaming content through use of the PRAGMATIC PLAY Marks on its website in 2015. (*Id*. ¶ 46). The website is internationally accessible. (*Id*.)

In addition to using the PRAGMATIC PLAY Marks, Plaintiff also possesses statutory rights in the PRAGMATIC PLAY Marks by virtue of its U.S. trademark registrations. (*Id*. ¶ 56). Plaintiff owns U.S. trademark registrations for both the PRAGMATIC PLAY word mark and composite mark in connection with "[e]ntertainment services, namely, providing games of chance via the Internet" (U.S. Reg. Nos. 6848492, 6890979). (Compl. ¶ 56, Exh. 29). [4]

Plaintiff also uses its PPGAMES mark to promote its online casino games via advertisements on social media. (*Id*. ¶ 50). On June 7, 2021, Pragmatic Play registered the domain name <PPGAMES.net> and for over two years has used <PPGames.net> as its official API domain. (*Id*. ¶¶ 47, 48). Additionally, Pragmatic Play hosts administrative websites at <backoffice.ppgames.net/admin>, which also incorporates and uses the PPGAMES mark. (*Id*. ¶ 49). As a result of Pragmatic Play's efforts, the PPGAMES mark has become affiliated with Pragmatic Play's business operation and promotion of Pragmatic Play's games. (*Id*. ¶ 51).

Plaintiff possesses statutory rights in the PPGAMES mark by virtue of its U.S. trademark

---

[4]     While the copies of the registrations list "PragmaticPlay International Limited" as the registrant, through a corporate reorganization, the PRAGMATIC PLAY Marks are now owned by Plaintiff Tamaris (Gibraltar) Limited, parent of PragmaticPlay International Ltd. (Compl. at 16 n. 2, Exh. 29).

registration for the PLAY PPGAMES mark in connection with "[d]ownloadable computer gaming software," among other goods and services (Reg. No. 7186621).  (Compl. ¶¶ 56, 57; Exh. 30). Plaintiff also owns a pending U.S. trademark application for the PPGAMES mark in connection with "[p]roviding on-line information in the field of computer gaming entertainment" (U.S. Serial No. 97450360).  (Compl. ¶¶ 56, 58).

Consumers have come to distinguish and recognize the legitimacy of Pragmatic Play's gaming services through the use and widespread promotion of the PRAGMATIC PLAY and PPGAMES Marks.  (*Id*. ¶ 52).  The PRAGMATIC PLAY and PPGAMES Marks have no significance outside being a source identifier for Pragmatic Play's products and services.  (*Id*. ¶ 55).  Based on Pragmatic Play's extensive use and promotion of the PRAGMATIC PLAY and PPGAMES Marks, and the recognition and goodwill the marks have achieved in the eyes of the consuming public, the PRAGMATIC PLAY and PPGAMES Marks are entitled to broad common law trademark rights in addition to the statutory rights provided by its U.S. trademark registrations. (*Id*. ¶¶ 52, 54, 56–58).

### *Defendants' Unlawful Use and Registration of the Domain Names*

Likely due to the financial elements of online gaming, Pragmatic Play is frequently combatting third parties' malicious attempts to misuse the PRAGMATIC PLAY and PPGAMES Marks to confuse, mislead, and/or deceive consumers.  (Compl. ¶ 53).  One of the ways in which bad actors threaten Pragmatic Play and its consumers is through "typosquatting," or the registration or use of a domain name that represents a typographical error to the trademark owner's legitimate website to distribute computer viruses or malware, to collect visitors' personal information for improper or illegal uses, or to send business impersonation emails.  (Compl. ¶ 2).  Typosquatting harms consumers by causing confusion with the legitimate websites being sought by the consumers

and very often results in consumers' computers being infected with viruses, consumers' personal information being collected and misused, and/or consumers being presented with unwanted advertisements. (*Id*. ¶ 3). To protect consumers from these bad actors, Pragmatic Play has engaged in significant enforcement efforts relating to its intellectual property, including defensive domain name registrations, administrative proceedings under the Uniform Domain Name Dispute Resolution Policy, take-down notices, and anti-cybersquatting litigation actions. (*Id*. ¶ 53) (listing cases brought by Pragmatic Play against infringing domain names).

The Defendant Domain Names consist of twenty-eight (28) .com or .net Internet domain names that, through typosquatting, appear to have been registered for the purpose of obtaining Internet visitors when such visitors were attempting to reach Pragmatic Play's legitimate website and/or services. (Compl. ¶¶ 6–33, 60). The Defendant Domain Names reflect complete incorporations and/or typographical errors of the PRAGMATIC PLAY and/or PPGAMES marks and are often combined with descriptive terms that relate to Pragmatic Play's services or terms that are geographically descriptive of markets where Pragmatic Play offers its services. (*Id*. ¶¶ 6–33, 59). For example, some of the Defendant Domain Names include descriptive terms, such as "GAMING," "BONANZA," "SLOT," "ZEUS," "STATIC," "GAME," "GOLD," "LINK," "PLAY," and "HACKS," which all relate to Pragmatic Play's gaming services. (*Id*. ¶¶ 7, 10, 12, 13, 15, 21, 25, 26, 27, 28, 29). Other Defendant Domain Names incorporate geographically descriptive terms or abbreviations, including "USA," "ASIA," "KR" or "KOR" (abbreviations for Korea), "SG" (abbreviation for Singapore), "EN" (abbreviation for England), "CN" (abbreviation for China), "JP" (abbreviation for Japan), "DK" (abbreviation for Denmark), and "TH" (abbreviation for Thailand). (*Id*. ¶¶ 6, 8, 11, 14, 16, 18, 22, 23, 24, 27, 30, 31, 33). Finally, some of the Defendant Domain Names incorporate typographical errors, common misspellings, or non-

9

distinctive characters, such as random numbers and letters.  (*Id*. ¶¶ 9, 17, 19, 20, 32).

All the Defendant Domain Names have been registered by either an out-of-country actor and/or by someone who has intentionally mispresented or concealed identifying information.  (*See* Compl. ¶¶ 6–33, 36, 72, 77).  According to the WhoIs registration data, the Defendant Domain Names are either registered to an unidentified person/entity using a privacy service to conceal their/its identity (Compl. ¶¶ 6–30)[5] or are registered to a named individual, identified as "Kim Dongchul" or "Kim Dongchel," who represents that they reside in South Korea (Compl. ¶¶ 31, 32, 33).  Registrant(s) of the Defendant Domain Names use the privacy services to replace a domain name owner's contact information with names such as "REDACTED FOR PRIVACY," or the WhoIs record contains no registrant name field, and thereby conceals the identity of the true owner(s) altogether.  (*Id*. ¶ 72).

Almost all of the Defendant Domain Names were registered within the last year, use similar privacy services to conceal the registrant of the domain names, cybersquat the PRAGMATIC PLAY and PPGAMES Marks in similar ways, and route to websites that reflect similar unlawful content.  (*Id*. ¶¶ 39, 73; Exhs. 1–28).  In fact, while the content of the websites associated with the Defendant Domain Names varies, many of the websites share highly similar content, exploiting not only the PRAGMATIC PLAY Marks and/or the PPGAMES mark, but use the content in similar ways to confuse customers trying to access Pragmatic Play's services.  Specifically, the Defendant Domain Names have been configured to display pay-per-click advertisements, for email services that could be used to impersonate Pragmatic Play, for API domain names to connect to

---

[5]     The Defendant Domain Names' registrants use various privacy services to conceal their identity, including Domains By Proxy, LLC, Withheld For Privacy ehf, Identity Protection Service, Cosmotown, Inc., Privacy Protect, LLC, and WHOIS IDCPrivacy Service.

unauthorized Pragmatic Play games[6] or to websites that display unauthorized copies and/or simulations of Pragmatic Play's intellectual property to mislead viewers into believing the site is affiliated with Pragmatic Play. (Compl. ¶¶ 61–65). For those Defendant Domain Names engaged in pay-per-click advertising, the registrant(s) of the Defendant Domain Names receive compensation when Internet visitors, attempting to reach Pragmatic Play's services, click on a link provided by a Defendant Domain Name, to a third-party website or when Internet visitors are automatically redirected to a third-party website for sales solicitation. (*Id*. ¶ 62). For those Defendant Domain Names configured for email service, the registrant(s) of the Defendant Domain Names have confirmed them to be used for the purpose of unlawful impersonation of Pragmatic Play. (*Id*. ¶ 63). For those Defendant Domain Names believed to be API domain names, the registrant(s) have configured the domain names to be used to operate unauthorized Pragmatic Play games. (*Id*. ¶ 64). And lastly, for the Defendant Domain Names engaged in misrepresentation as affiliates of Pragmatic Play, the registrant(s) of those domain names receive compensation when Internet visitors are directed to third-party gaming services, including monies collected from the deceived visitors. (*Id*. ¶ 65).

The use of the PRAGMATIC PLAY and PPGAMES Marks within the Defendant Domain Names and associated websites are without authorization from Pragmatic Play. (*Id*. ¶ 66). The Defendant Domain Names do not reflect and cannot reflect the legal name of the registrant(s). (*Id*. ¶ 67). The Defendant Domain Names have not engaged in bona fide noncommercial or fair use of the PRAGMATIC PLAY and PPGAMES Marks in an accessible website, and instead, attempt

---

[6]     An "API," or application programming interface, is a software intermediary that allows computer programs to communicate with each other. (Compl. at 6 n. 1). Plaintiff asserts that some of the Defendant Domain Names were configured as an API domain used for online gaming services that are identical and/or similar and/or related to Pragmatic Play's gaming services. (Compl. ¶¶ 14, 15, 16, 19, 21, 22, 23, 27, 32, 33).

to mispresent themselves as Pragmatic Play or affiliates thereof.  (*Id*. ¶ 68).

**Jurisdiction and Venue**

In this case, the Court must have both subject matter jurisdiction and *in rem* jurisdiction over the Defendant Domain Names, and venue in this judicial district must be proper before the Court can render a default judgment.

### *Subject Matter Jurisdiction*

Plaintiff brings this cause of action pursuant to the ACPA (15 U.S.C. § 1125 *et seq*.). Therefore, the undersigned finds the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as the violations of the ACPA raise a federal question.   This Court also has subject matter jurisdiction pursuant to both 28 U.S.C. § 1338(a) and 15 U.S.C. § 1121(a), which grant jurisdiction to federal district courts for civil actions arising under federal trademark law.

### *In Rem Jurisdiction*

In order to establish *in rem* jurisdiction, 15 U.S.C. § 1125(d)(2)(A) requires the Plaintiff to show that the Defendant Domain Names violate Plaintiff's rights as the owner of the PRAGMATIC PLAY Marks and PPGAMES mark, and Plaintiff is not able to obtain *in personam* jurisdiction over a person who would have been a defendant in a civil action or that despite its due diligence Plaintiff is unable to find a person who would have been a civil defendant in a civil action.  Specifically, 15 U.S.C. § 1125(d)(2)(A) provides, in pertinent part:

> The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if –
>
> > (i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c); and
> >
> > (ii) the court finds that the owner –
> >
> > > (I) is not able to obtain in personam jurisdiction over a person who would

12

have been a defendant in a civil action under paragraph (1); or

(II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) by –

(aa) sending notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and

(bb) publishing notice of the action as the court may direct promptly after filing the action.

As set forth in the Fed. R. Civ. P. 12(b)(6) analysis below, the facts alleged in the Complaint and deemed admitted for purposes of this motion, properly state a claim for cybersquatting in violation of the ACPA.  Therefore, the undersigned finds the first statutory prong needed to establish *in rem* jurisdiction is satisfied.  *See* 15 U.S.C. § 1125(d)(2)(A)(i).

Next, the record clearly establishes that Pragmatic Play has also satisfied the second statutory prong needed to establish *in rem* jurisdiction.  *See* 15 U.S.C. § 1125(d)(2)(A)(ii).  As a threshold matter, the WhoIs database for the Defendant Domain Names either did not contain the identities of the registrants because they were concealed, or the registrant(s) have identified themselves as being outside the United States and are therefore not subject to the Court's personal jurisdiction.  (Compl. ¶ 36; Mem. Supp. at 6–7).  Therefore, the identity of the registrant(s) of the Defendant Domain Names are unidentified, unknown, are concealed through a privacy service, contain a fictious person/entity, or identify an individual residing outside the United States.  (*Id.*)  As a result, Plaintiff was unable to obtain *in personam* jurisdiction over a person who would have been a defendant in this cybersquatting action.  Therefore, the undersigned finds the second statutory prong needed to establish *in rem* jurisdiction is satisfied.  *See* 15 U.S.C. § 1125(d)(2)(A)(ii)(I).

The second statutory prong needed to establish *in rem* jurisdiction is also satisfied if

through due diligence Plaintiff was not able to find a person who would have been a defendant in a civil action by (1) sending notice of the alleged violation and intent to proceed to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar, and (2) publishing notice of the action as the court may direct promptly after filing the action. *See* 15 U.S.C. § 1125(d)(2)(A)(ii)(II). Here again, the record clearly establishes the individuals responsible for registering the Defendant Domain Names have successfully concealed their identities and location or are outside the jurisdiction of the United States, leaving Plaintiff no reasonable opportunity to find the individuals and bring them before the Court as a defendant in this civil action.

Moreover, on December 13 and 14, 2023, Plaintiff's counsel sent letters on behalf of Pragmatic Play to the current registrants of the Defendant Domain Names—via email and, if available, by mail—with notice of the alleged allegations and Pragmatic Play's intent to proceed *in rem* under the ACPA and included a copy of the Complaint. (Dkt. 4-1 ¶ 7, Exh. A).[7] If the registrant concealed all contact information, Plaintiff's counsel sent the letter to the registrar and/or listed privacy service. (*Id*.) Pragmatic Play remains unable to identify a person or entity who would be a defendant and over whom there would exist personal jurisdiction in the United States for any of the Defendant Domain Names. (*Id*. ¶ 8). Thus, Plaintiff complied with § 1125(d)(2)(A)(ii)(II)(aa).

Finally, § 1125(d)(2)(A)(ii)(II)(bb) requires an *in rem* plaintiff to provide notice of the proceeding by "publishing notice of the action as the court may direct promptly after filing the

---

[7]     For many of the Defendant Domain Names, due to the lack of identifiable information regarding the registrant, the only way of providing notice was through the registrar's online portal. The online portal did not allow attachments; however, Plaintiff's counsel notified the current registrant via the portal that if they were interested in receiving a copy of the Complaint, they could contact counsel at the provided contact information. (Dkt. 4-1, Exh. B).

action."  On December 22, 2023, Plaintiff filed a Motion for Service by Publication, which was granted by the Court on December 28, 2023.  (Dkts. 3, 6).  Plaintiff complied with the December 28, 2023 Order, causing the Order to be published in *The Washington Times* on January 5, 2024 and serving the Order on Defendant Domain Names via electronic means, and by mail to the registrars and/or privacy service for those registrants, when electronic means was unavailable. (Dkt. 8; Mem. Supp. at 8).

Plaintiff need only satisfy either § 1125(d)(2)(A)(ii)(I) or § 1125(d)(2)(A)(ii)(II) to meet the second statutory prong required to establish *in rem* jurisdiction.  Although 15 U.S.C. § 1125(d)(2)(A)(ii)(I) and § 1125(d)(2)(A)(ii)(II) provide independent grounds upon which *in rem* jurisdiction may be established, here the record clearly demonstrates that Plaintiff properly alleged facts that satisfy both prongs of § 1125(d)(2)(A)(ii).  For these reasons, the undersigned finds the Court has *in rem* jurisdiction over each of the Defendant Domain Names pursuant to 15 U.S.C. § 1125(d)(2)(A) and Plaintiff has fully complied with the Court's December 28, 2023 Order.

### Venue

Pursuant to 15 U.S.C. § 1125(d)(2)(C), for an *in rem* action, the domain name "shall be deemed to have its situs" in the judicial district where the "registrar, registry, or other domain name authority" is located.  Here, Plaintiff properly alleges that the principal place of business of the .COM and .NET domain name registries, Verisign, Inc., is situated in this judicial district, and all the Defendant Domain Names are .COM and .NET domain names.  (Compl. ¶ 38).  Therefore, the undersigned recommends the Court find venue to be proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 1125(d)(2)(C).

### Joinder of Defendant Domain Names

Rule 20(a)(2) permits joinder of persons as defendants when "any right to relief . . . aris[es]

out of the same transaction, occurrence, or series of transactions or occurrences; and [] any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). Here, Plaintiff asserts that joinder of the Defendant Domain Names is proper because each *in rem* cybersquatting claim arises out of the same series of transactions and involve common questions of law or fact. (Compl. ¶ 39; Mem. Supp. at 7–8). The WhoIs registration records demonstrate that all the Defendant Domain Names cybersquat the same PRAGMATIC PLAY or PPGAMES marks and do so in similar ways, including adding descriptive terms or nondescriptive characters to Pragmatic Play's protected marks. (*Id*.) Additionally, almost all the Defendant Domain Names were registered within the last year and use privacy servicers to conceal the identity of the domain names' registrant(s), except for one individual listed registrant—"Kim Dongchul" or "Kim Dongchel"—for three of the Defendant Domain Names. (*Id*.) Thus, the Defendant Domain Names were all registered in the same series of registration transactions, occurring in the same general time period, using the same methods and with a common purpose of cybersquatting on the PRAGMATIC PLAY and PPGAMES marks, to unidentified or foreign (and potentially fictitious) registrant(s), with many of the associated websites similarly displaying misleading content to purposefully confuse visitors regarding an affiliation with Pragmatic Play. (Mem. Supp. at 7). These facts, when applied to the asserted claim under the ACPA, raise common questions regarding the confusing similarity to Pragmatic Play's distinctive marks and the common indicia of bad faith registration. *See PragmaticPlay Int'l Ltd. v. 789PragmaticPlay.com,* No. 1:22-cv-835 (CMH/JFA) [Dkt. No. 17] (E.D. Va. Dec. 9, 2022) (finding Rule 20 joinder appropriate where 161 defendant domain names shared common facts including registration in the same general time frame and use of the same methods of cybersquatting). For these reasons, and given the precedent of this District, the undersigned finds the Defendant Domain Names are properly joined in a single

Complaint pursuant to Fed. R. Civ. P. 20.

In the alternative, if Rule 20 is not a proper basis to join *in rem* defendants in a cybersquatting action, the Defendant Domain Names are properly joined under Fed. R. Civ. P. 21. Rule 21 allows courts to include parties in a single action "on just terms," which has been interpreted within this District to include maintaining ACPA actions against multiple domain names presenting similar questions of fact and law. *See Coach, Inc. v. 1941 Coachoutletstore.com,* No. 1:11CV309 (JCC/JFA), 2012 WL 27918, at *4 (E.D. Va. Jan. 5, 2012); *see also Lendingclub Bank, Nat'l. Assoc. v. LenddingClub.com,* 1:22-cv-484 (AJT/JFA) [Dkt. No. 23] (E.D. Va. Feb. 27, 2023) (finding joinder appropriate under Rule 21 where the plaintiff failed to support joinder under Rule 20); *789PragmaticPlay.com,* No. 1:22-cv-835 (CMH/JFA) [Dkt. No. 17] (finding, in the alternative to application of Rule 20, that the court should disregard any defects in joinder of 161 domain names because none of the defendants had been prejudiced by the joinder). In similar situations, this District has consistently allowed joinder of domains as defendants. *See, e.g., Coach,* 2012 WL 27918 (maintaining a single cybersquatting action against 356 domain names); *Cent. Source LLC v. Aannualcreditreports.com,* No. 1:21-cv-1439 (LMB/TCB), 2022 WL 3337805, at *1 (E.D. Va. Apr. 21, 2022) (recommending entry of default judgment against eighty-four domain names cybersquatting the same mark); *Cent. Source LLC v. Ann. 1 creditreport.com,* No. 1:17-cv-581 (AJT/IDD), 2018 WL 2770194, at *1 (E.D. Va. June 8, 2018) (granting default judgment against 102 domain names cybersquatting the same mark). In this case, each Defendant Domain Name presents similar questions of law and fact, and as a result, their joinder in a single Complaint is "on just terms." Therefore, the undersigned also finds the Defendant Domain Names are properly joined pursuant to Fed. R. Civ. P. 21.

**Service of Process**

Fed. R. Civ. P. 4(n)(1) states that "[t]he court may assert jurisdiction over property if authorized by a federal statute" and notice to claimants of the property is given as provided in the statute.  The ACPA explicitly authorizes service of process for *in rem* actions.   Specifically, 15 U.S.C. § 1125(d)(2)(B) provides that the "actions under subparagraph (A)(ii) shall constitute service of process."   Subparagraph (A)(ii) requires the Plaintiff to satisfy either of the two following conditions:

> (I) [Plaintiff] is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or
>
> (II) through due diligence [Plaintiff] was not able to find a person who would have been a defendant in a civil action under paragraph (1) by –
>
>> (aa) sending notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and
>>
>> (bb) publishing notice of the action as the court may direct promptly after filing the action.

Satisfying one of these two conditions is also necessary to establish *in rem* jurisdiction under the ACPA.  When addressing *in rem* jurisdiction above, the undersigned applied the properly pled facts in the record to the statutory requirements and determined that Plaintiff satisfied both provisions of subparagraph (A)(ii).

As previously noted, Plaintiff provided the current registrant(s) of the Defendant Domain Names with notice of the alleged violations and Pragmatic Play's intent to proceed *in rem* under the ACPA and included a copy of the Complaint.  (Dkt. 4-1 ¶ 7, Exhs. A, B).  The notices were sent through the contact information available from the registration information on the WhoIs database for the Defendant Domain Names, including to the physical and email addresses

provided, and to the registrar and/or privacy service where the registrant provided no information whatsoever.   (*Id*.)   In addition to sending notice to the Defendant Domain Names through the physical and email addresses provided, Plaintiff also sent separate notices to any online contact portals listed in the WhoIs record.   (*Id*.)   Thereafter, Plaintiff fulfilled the final statutory requirement by "publishing notice of the action" on January 5, 2024 as the Court ordered pursuant to 15 U.S.C. § 1125(d)(2)(A)(ii)(II)(bb).   (Dkt. 8; Mem. Supp. at 8).   Therefore, for the same reasons the undersigned held that Plaintiff established *in rem* jurisdiction, the undersigned also finds that Plaintiff properly effected service of process on the Defendant Domain Names.

## Fed. R. Civ. P. 12(b)(6) Analysis of Plaintiff's Cybersquatting Claim

Before entering default judgment, the Court must evaluate the plaintiff's complaint against the standards of Fed. R. Civ. P. 12(b)(6) to ensure that the complaint properly states a claim. *GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003). Plaintiff has brought a cause of action for cybersquatting in violation of the ACPA, 15 U.S.C. § 1125(d). (Compl. ¶ 1, 74–80).   For the reasons set forth below, the undersigned finds that Plaintiff has properly alleged a cybersquatting claim against the Defendant Domain Names.

The ACPA allows the owner of a mark to file an *in rem* action against a domain name if the domain name violates "any right of the owner of a mark."   *See* 15 U.S.C. § 1125(d)(2)(A). This encompasses rights against cybersquatting provided for under § 1125(d)(1).   *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 228, 232 (4th Cir. 2002).   Therefore, the owner of a mark can be entitled to *in rem* relief upon proving a violation of § 1125(d)(1).   Section 1125(d)(1) creates civil liability for registering, trafficking in, or using a domain name that is "identical or confusingly similar" to a plaintiff's mark, with a "bad faith intent to profit from that mark." 15 U.S.C. § 1125(d)(1)(A).   Thus, to sufficiently plead an ACPA violation, a plaintiff must

allege the plaintiff's ownership of a valid and protectable trademark, the registrant's use of a domain name that is "identical or confusingly similar to, or dilutive of" plaintiff's distinctive mark, and the registrant's bad faith intent to profit from the mark or domain name.  15 U.S.C. § 1125(d)(1)(A); *see People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367 (4th Cir. 2001).

### 1. The PRAGMATIC PLAY and PPGAMES Marks are Valid, Protectable, and Distinctive Marks

"A necessary predicate to an ACPA action is that a plaintiff has a protectable interest in a trademark."  *BlackRock, Inc. v. BALCKROCK.com*, No. 122CV1002TSEJFA, 2022 WL 17684800, at *5 (E.D. Va. Nov. 18, 2022), *report and recommendation adopted*, No. 1:22-CV-1002, 2022 WL 17672497 (E.D. Va. Dec. 13, 2022) (citing *Wagner v. lindawagner.com*, 202 F. Supp. 3d 574, 580–81 (E.D. Va. 2016)).  A plaintiff can establish they have a protectable interest in a mark through showing ownership of a federal trademark registration or, for unregistered marks, under common law by establishing secondary meaning.  *See Wagner*, 202 F. Supp. 3d at 580 (holding that because plaintiff never registered her mark, the only basis upon which it can be protected would be under common law by establishing secondary meaning).  Thus, a party may assert a protectable interest in an unregistered trademark if the mark is (1) used in commerce, and (2) sufficiently distinctive.  *See Int 7 Bancorp, LLC V. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 363 (4th Cir. 2003).  Here, Plaintiff has established that it has a protectable interest in the PRAGMATIC PLAY and PPGAMES Marks through its federal trademark registrations and common law ownership of the marks.

Trademarks may be considered "fanciful," "arbitrary," or "suggestive," which are all inherently "distinctive."  *Venetian Casino Resort v. Venetiangold.Com*, 380 F. Supp. 2d 737, 742

(E.D. Va. July 28, 2005) (citing *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996)).  They may also be considered merely "descriptive," which is not inherently distinctive, but is distinctive if the mark acquires "secondary meaning," i.e., "if in fact a substantial number of present or prospective customers understand the designation" to refer to a particular business enterprise.  *Id*. (quoting *Perini Corp. v. Perini Constr., Inc*., 915 F.2d 121, 125 (4th Cir. 1990)).

Pragmatic Play owns two federal trademark registrations for the mark PRAGMATIC PLAY on the Principal Trademark Register of the U.S. Patent and Trademark Office (Reg. Nos. 6848492, 6890979), which entitles Pragmatic Play to a statutory presumption of exclusivity. (Compl. ¶ 56, Exh. 29); *see* 15 U.S.C. § 1057(b); *Am. Online, Inc. v. AT & T Corp*., 243 F.3d 812, 816 (4th Cir. 2001) ("a certificate of registration which provides the registrant with prima facie evidence of (1) the validity of the mark and its registration; (2) the registrant's ownership; and (3) the registrant's "exclusive right" to use the mark on or in connection with the goods and services specified in the certificate of registration[]").  Additionally, Pragmatic Play possesses statutory rights in the PPGAMES mark, by virtue of its federal trademark registration for the mark PLAY PPGAMES (Reg. No. 7186621), and also owns a pending trademark application for the mark PPGAMES (U.S. Serial No. 97450360).  (Compl. ¶¶ 56, 57, 58, Exh. 30).  Pragmatic Play's trademark registrations serve as prima facie evidence that the marks have acquired distinctiveness, and at a minimum, are descriptive and have secondary meaning.  *See Am. Online, Inc.* 243 F.3d at 816 ("With a certificate of registration [] the registrant obtains prima facie evidence that its mark is not generic in the eyes of the relevant public, [] and that its mark is not "merely" descriptive, but at a minimum is descriptive and has obtained secondary meaning); *Venetian Casino Resort*, 380 F. Supp. 2d at 742.  Thus, the undersigned presumes the PRAGMATIC PLAY Marks and PPGAMES mark, by virtue of its trademark registration for the mark PLAY PPGAMES, are at the

very least, descriptive and have acquired secondary meaning.

In addition to its statutory rights, Pragmatic Play is also entitled to common law trademark rights in the PRAGMATIC PLAY and PPGAMES Marks. *See Emergency One, Inc. v. Am. Fire Eagle Engine Co*., 332 F.3d 264, 267 (4th Cir. 2003) ("At common law, trademark ownership is acquired by actual use of the mark in a given market."). Since receiving its license in 2016, Pragmatic Play has continuously used the PRAGMATIC PLAY and PPGAMES Marks to develop, offer, and supply a wide range of casino games in various jurisdictions. (Compl. ¶¶ 41, 43). Pragmatic Play's gaming services are available through social casino operators in select states in the U.S. and are available to U.S. citizens abroad. (*Id.* ¶ 44). Pragmatic Play has actively marketed its services under the PRAGMATIC PLAY and PPGAMES marks through public relations campaigns, paid and earned content marketing, paid advertising, sponsored and attended virtual and physical events, and through social media, leading to significant consumer and industry recognition. (*Id.* ¶ 45).

Moreover, Pragmatic Play owns and operates the PRAGMATICPLAY.com and PPGAMES.com domain names, which have been used since their creation to promote its gaming business. (*Id.* ¶ 46–49). The PRAGMATICPLAY.com domain has been active since 2015, consistently publishing gaming content available for consumers to access, and the PPGAMES.com domain has been active since 2021, which Pragmatic Play uses as its official API domain and to host administrative website. (*Id.*) Thus, continuous use of a domain name that incorporates a trademark and is used to identify the source of goods or services is also sufficient to establish common law trademark rights. *See Tober v. APROV.COM*, No. 1:07- CV-1252 LMB/TCB, 2008 WL 4364221, at *2 (E.D. Va. Sept. 23, 2008) (recognizing common law trademark rights where a trademark is used in a domain, if that mark "is used to identify the source of goods and services").

Pragmatic Play's consistent and prominent use of the PRAGMATIC PLAY and PPGAMES Marks in commerce render the marks distinctive, as it has acquired secondary meaning, and entitles the marks to common law protection.

Based on the foregoing, Pragmatic Play's statutory and common law trademark rights in the PRAGMATIC PLAY and PPGAMES Marks predate the registration of any of the Defendant Domain Names and were "distinctive at the time of registration of the domain names." *See* 15 U.S.C. § 1125(d)(1)(A)(ii)(I); (Mem. Supp. at 13). Thus, considering both Pragmatic Play's trademark registrations and continuous common law use of the PRAGMATIC PLAY and PPGAMES Marks, Pragmatic Play possesses valid and protectable rights in its distinctive marks and is entitled to enforce the provisions of Section 1125(d) against any domain name that violates those rights.

### 2. Defendant Domain Names are Confusingly Similar to Pragmatic Play's Marks

The undersigned finds the Defendant Domain Names are confusingly similar to the PRAGMATIC PLAY and PPGAMES Marks. *See* 15 U.S.C. § 1125(d)(1)(A)(ii); *see also People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367 (4th Cir. 2001). First, the PRAGMATIC PLAY and PPGAMES Marks are distinctive and were distinctive at the time the Defendant Domain Names were registered. Second, the infringing domain name does not need to be identical to the registered mark, only confusingly similar. *See* 15 U.S.C. § 1125(d)(1)(A)(ii)(I); *see also Volvo Trademark Holding AB v. Volvospares.com*, 703 F. Supp. 2d 563, 568 (E.D. Va. 2010). The confusing similarity standard is satisfied where a domain name is similar to a protected mark such that a "reasonable consumer 'might think they were used, approved, or permitted by [the plaintiff].'" *Venetian Casino Resort*, 380 F. Supp. 2d at 743 (quoting *Harrods, Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 677 (E.D. Va. June 27, 2001), *rev'd on other*

*grounds*, 302 F.3d 214 (4th Cir. 2002)).  Stated differently, a confusingly similar domain name

and mark are "so similar in sight, sound and meaning that they could be confused."  *Id.* (internal

quotation marks and citation omitted).  Moreover, courts do not consider top-level domains, such

as ".com," to determine whether a domain name is similar or identical to a mark under the ACPA.

*See Jewels Connection, Inc. v. OroClub.com*, No. 1:20-cv-0364-TSE-MSN, 2020 WL 5099555,

at *3 (E.D. Va. Aug. 10, 2020), *report and recommendation adopted*, No. 1:20-CV-0364-TSE-

MSN, 2020 WL 5097515, at *3 (E.D. Va. Aug. 28, 2020) ("Here, the mark is unquestionably

almost identical—the only difference between the OROCLUB mark and OroClub.com is the

'.com' suffix. Accordingly, the undersigned finds that defendant domain name is confusingly

similar to the OROCLUB mark.").

Here, each of the Defendant Domain Names incorporates either the entire PRAGMATIC

PLAY and/or PPGAMES marks, or includes typographical errors thereof, which do not serve to

distinguish the domain names from the marks. (Compl. ¶ 59); *see Fox News Network, LLC v.*

*xofnews.com*, No. 1:20-cv-00149, 2021 WL 5042995, at *5 (E.D. Va. Apr. 6, 2021) (finding that

typosquatting "satisfies the confusingly similar requirement").   The construction of the

typosquatting Defendant Domain Names was clearly intended to confuse customers, and its

similarity in sight and meaning could reasonably do so.  (Compl. ¶¶ 4, 60); *Central Source LLC v.*

*annualcreditreport.com*, 2014 WL 3811162, at *7 (E.D. Va. Aug. 1, 2014) (finding that the

defendant domain names satisfy the confusingly similar test where the "misspelling of the

AnnualCreditReport mark constitutes a clear attempt at typosquatting of the AnnualCreditReport

mark insofar as omitting or inserting a letter or letters from the word 'AnnualCreditReport,'

altering the order of the letters in the word 'AnnualCreditReport,' or substituting a different letter

in the word 'AnnualCreditReport' takes advantage of common errors made in typing by consumers

when attempting to reach <annualcreditreport.com>.").   Additionally, while many of the Defendant Domain Names include other elements, such as random numbers and letters (e.g., "DK10" or "GSTW0") or terms (e.g., "SLOT" or "GAMING"), many of these additional terms, whether they are descriptive or generic, reinforce, rather than distinguish, the association between Pragmatic Play by using descriptive terms related to Pragmatic Play's services.  (Compl. ¶¶ 6–33, 59); *see Volvo Trademark Holding AB v. Volvospares.com*, 703 F. Supp. 2d 563, 568 (E.D. Va. 2010) (noting that the addition of generic terms does not diminish confusing similarity); *Venetian Casino Resort, LLC*, 380 F. Supp. 2d 737 at 743 ("Irrespective of whether 'gold' is suggestive or generic, the Court finds that Defendant Domain Names are confusingly similar to Plaintiff's marks because they 'bear such a visual resemblance that internet users would reasonably assume that the names were modified, used, approved, and/or permitted' by the plaintiff.").  Moreover, in each of these Defendant Domain Names, the PRAGMATIC PLAY and/or PPGAMES marks are clearly the dominant portion of each domain name.   For these reasons, the undersigned finds that Pragmatic Play has alleged sufficient facts to satisfy the "confusing similarity" requirement of the ACPA.  *See Agri-Supply Company, Inc. v. Agrisupply.Com*, 457 F. Supp. 2d 660, 663 (E.D. Va. Sept. 13, 2006) (holding the domain name was confusingly similar because it was "virtually identical" to Plaintiff's trademark).

### 3.  *Registrants Have Acted with a Bad Faith Intent to Profit from Pragmatic Play's Marks*

Finally, the undersigned finds Pragmatic Play has demonstrated the registrant(s) bad faith intent to profit from the PRAGMATIC PLAY and/or PPGAMES marks.  Under the ACPA, bad faith intent may be considered by weighing nine factors:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i). The factors are given to courts as a guide and need not be exhaustively considered in every case. *Lamparello v. Falwell*, 420 F.3d 309, 319-20 (4th Cir. 2005). Indeed, "the most important grounds for finding bad faith 'are the unique circumstances of th[e] case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute.'" *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 268 (4th Cir. 2001) (quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 499 (2d Cir. 2000)).

The undersigned finds that Factors I through IV overwhelmingly support Pragmatic Play's allegation of a bad faith intent to profit from use of the PRAGMATIC PLAY and/or PPGAMES marks.  First, the registrants of the Defendant Domain Names have no intellectual property rights in the Defendant Domain Names, or any portion of the Defendant Domain Names, and instead use Pragmatic Play's trademark rights without authorization.  15 U.S.C. §§ 1125(d)(1)(B)(i)(I); (Compl. ¶ 66; Mem. Supp. at 15).  The Defendant Domain Names also do not incorporate or "consist of the legal name of the [registrant] or a name that is otherwise commonly used to identify that [registrant]" nor have any of the Defendant Domain Names been previously used in connection with the bona fide offering of any goods or services.  15 U.S.C. § 1125(d)(1)(B)(i)(II), (III); (Compl. ¶¶ 67, 68).  Instead, the record reflects that at least twenty-one (21) domain names have been used to offer and/or promote online gaming services that are identical and/or related to Pragmatic Play's legitimate gaming services, showing intentional copying of Pragmatic Play's intellectual property to confuse or mislead consumers.  (Compl. ¶¶ 7, 11–23, 25, 27, 39, 30–33; Mem. Supp. at 15).  Moreover, there is no evidence before the Court to suggest that the registrants engaged in bona fide noncommercial or fair use of the PRAGMATIC PLAY and/or PPGAMES marks in a website accessible under the Defendant Domain Names.  15 U.S.C. § 1125(d)(1)(B)(i)(IV); (Compl. ¶ 68).  Quite the opposite, all reasonable inferences to be drawn from the properly alleged facts suggest that the registrants acted with a nefarious intent to profit by deceiving Pragmatic Play's customers.

Additionally, the undersigned finds factor V supports Plaintiff's allegation of bad faith.  The registrants have duplicated and fully incorporated Plaintiff's distinctive marks into the Defendant Domain Names without authorization or permission.  The inclusion of typographical errors, random numbers, or descriptive, related terms is clearly a premeditated effort to divert

27

customers from Pragmatic Play's legitimate online location to an accessible site that would likely harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or enforcement of the site.  Moreover, many of the Defendant Domain Names route to accessible sites that include pay-per-click advertising, malware, bloatware, unauthorized Pragmatic Play games, unauthorized email services to be used to send email for the purpose of unlawful impersonation of Pragmatic Play, or to third-party gaming services misrepresenting themselves as affiliates of Pragmatic Play that include pirated Pragmatic Play software.  (*See* Compl. ¶¶ 61–65); 15 U.S.C. § 1125(d)(1)(B)(i)(V).

Finally, the undersigned also finds factor VII supports Pragmatic Play's allegation of bad faith.  The contact information for the registrant(s) of the Defendant Domain Names is misleading, in that almost all the registrants of the Defendant Domain Names purposefully concealed their identifying contact information using the privacy service of the registrar.  (*See* Compl. ¶¶ 6–30; Mem. Supp. at 16).  For these Defendant Domain Names, the registrant(s) did not provide legitimate contact information on its domain name registration to reflect an actual person or entity, but instead, only provided limited contact information via a privacy service or an online portal to contact the registrant(s).  (*Id.*); *Montblanc-Simplo GmbH v. AChatStyloMontblanc.com*, No. 1:13-CV-1013, 2014 WL 107395, at *6 (E.D. Va. Jan. 3, 2014) (finding bad faith where true identity and correct service address have not been provided).  Of the remaining three Defendant Domain Names that have identified an individual, they all appear to have been registered by the same person, identifying the registrant as "Kim Dongchul" or "Kim Dongchel," which is likely an alias. (Compl. ¶¶ 31–33; Mem. Supp. at 16).  Under the facts of this case, such an effort to conceal the identities of those who created and operated the Defendant Domain Names is a clear sign of their

28

bad faith intent.

Applying the statutory factors to the properly pled allegations in the Complaint, Pragmatic Play has sufficiently established a "bad faith intent to profit" from Defendants' use of the PRAGMATIC PLAY and/or PPGAMES marks. *See Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d at 268 (noting the bad faith analysis depends upon "unique circumstances" of each case). For these reasons, the undersigned finds that Pragmatic Play has established a violation of the ACPA.

## Requested Relief

The undersigned, having determined that Pragmatic Play has satisfied all statutory and procedural requirements necessary to obtain a default judgment, now turns to Pragmatic Play's request to transfer ownership and control of the Defendant Domain Names to Plaintiff. (Compl. Prayer for Relief; Dkt. 12-1, Proposed Order).

Pursuant to 15 U.S.C. § 1125(d)(1)(C), "[i]n any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." Indeed, § 1125(d)(2)(D) limits the remedy for any cause of action brought *in rem* to "a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." Pragmatic Play, having established a violation of the ACPA in this *in rem* action, is entitled to its requested relief of transfer of the Defendant Domain Names to Plaintiff, as permitted by 15 U.S.C. §§ 1125(d)(1)(C), (2)(D). *See Int'l Bancorp, L.L.C. v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco*, 192 F. Supp. 2d 467, 490 (E.D. Va. 2002).[8]

---

[8]     In the Complaint, Plaintiff also requested reasonable attorneys' fees and costs incurred by Plaintiff in connection with this action pursuant to 15 U.S.C. § 1117(a). (Compl. Prayer for Relief). However, because the Plaintiff did not move for such relief under its Motion for Default Judgment,

## Recommendation

For the reasons outlined above, the undersigned United States Magistrate Judge recommends the Court grant default judgment against the Defendant Domain Names with respect to Plaintiff's claim for violations of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). Specifically, the undersigned recommends that the Court:

- **GRANT** Plaintiff's Motion for Default Judgment against the Defendant Domain Names as to Count I of the Complaint;

- Enter an order requiring VeriSign, Inc. to change the registrars of record for the Defendant Domain Names to Plaintiff's domain name registrar of choice, SafeNames Ltd.; and

- Enter an order requiring that SafeNames Ltd. shall take all necessary steps to have Plaintiff Tamaris (Gibraltar) Limited listed as the registrant for the Defendant Domain Names.

## Notice

Plaintiff is directed to e-mail a copy of this Report and Recommendation to the registrar(s) and/or the listed privacy service(s) of the Defendant Domain Names and to the Defendants at the e-mail addresses the registrants provided to the registrar, if available, within seven (7) days of entry of this Order. Plaintiff is further directed to file a declaration certifying e-mail service of this Report and Recommendation on the registrar and the Defendants via the Court's electronic filing system within ten (10) days of this Order. The parties are advised that objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of its service. Failure to file timely

---

the undersigned will not consider Plaintiff's request.

objections waives appellate review of any judgment or decision based on this Report and Recommendation.

_William E. Fitzpatrick_
WILLIAM E. FITZPATRICK
UNITED STATES MAGISTRATE JUDGE

June 11, 2024
Alexandria, Virginia

31